IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTINA BARRON,<br><br>        Plaintiff,<br><br>   vs.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>        Defendant.<br>_____/ | CASE NO. CV-F-04-6392 AWI LJO<br><br>**FINDINGS AND RECOMMENDATIONS ON SOCIAL SECURITY COMPLAINT**<br>(Docs. 12, 13.) |

## **INTRODUCTION**

Plaintiff Cristina Barron ("plaintiff") seeks this Court's review of an administrative law judge's ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433 and 1381-1381d. Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court RECOMMENDS to deny plaintiff's request to reverse the Commissioner's denial of disability insurance benefits and SSI or to remand for further proceedings.

## **BACKGROUND**

### **Plaintiff's Personal Background**

Plaintiff is age 43, has an eighth grade education, and has past work experience as a PBX/telephone operator, water tester and taper loader. (AR 17, 95, 290.)

**Administrative Proceedings**

On November 7, 2000, plaintiff filed disability insurance and SSI applications to claim disability since August 2000 based on left shoulder and neck pain and inability to lift her left arm. (AR 56, 89, 215, 306.) With its January 31, 2001 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined plaintiff's condition was not disabling on any date through March 2000 when plaintiff was last insured for disability benefits. (AR 42.)

On February 23, 2001, plaintiff filed her Request for Reconsideration to claim that she continued to experience pain and was unable to raise her arm without pain and was scheduled for surgery. (AR 41.) With its May 22, 2001 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that although plaintiff's condition prevents her past work, it does not preclude her from all work. (AR 31, 36.)

On June 5, 2001, plaintiff filed her Request for Hearing by Administrative Law Judge to claim that she is "in constant pain," worsening from her left neck to her elbow, and inability to raise her arm and reach back. (AR 30.) On November 5, 2001, counsel was appointed for plaintiff. (AR 24.) After a February 25, 2002 hearing, the ALJ issued his June 25, 2002 decision to conclude that plaintiff has the residual functional capacity to perform a wide range of light work with limitations of occasional reaching and fingering with her left upper extremity. (AR 232-233.)

Plaintiff submitted to SSA' Appeals Council her July 5, 2002 Request for Review of Hearing Decision to seek review of the ALJ's decision. (AR 237.) With its February 13, 2003 order, the Appeals Council remanded plaintiff's case to the ALJ level to obtain vocational expert evidence to clarify assessed limitations on plaintiff's occupational base and to resolve conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles and its companion publication the Selected Characteristics of Occupations. (AR 241, 242.)

After a June 24, 2003 hearing with vocation expert testimony, the ALJ issued his September 19, 2003 decision to conclude that plaintiff has the residual functional capacity to perform a significant range of light work and is neither disabled nor entitled to disability insurance benefits nor SSI. (AR 22-23.) Plaintiff submitted to the Appeals Council her October 9, 2003 Request for Review of Hearing Decision to seek review of the ALJ's decision. (AR 11.) On August 19, 2004, the Appeals Council

denied plaintiff's request to review the September 19, 2003 ALJ decision to render it as the Commissioner's final decision subject to this Court's review. (AR 5.)

## Medical History And Records Review

### *Stanislaus County Health Services*

Plaintiff treated at Stanislaus County Health Services and chiefly with John Castro, M.D. ("Dr. Castro"). On August 10, 2000, plaintiff complained of left hand numbness and burning and pain to an ankle she had twisted in 1999. (AR 121.) Plaintiff could not rotate the ankle. (AR 121.) August 11, 2000 diagnostic imaging revealed plaintiff's normal thoracic spine and spurring of C4 as to plaintiff's cervical spine. (AR 110.) Diagnostic imaging for plaintiff's ankle was normal. (AR 110.) On August 14, 2000, plaintiff complained of ankle pain and swelling with occasional sharp pains. (AR 213.) Progress notes reflect that plaintiff's left ankle interfered with her temporary work. (AR 213.) Plaintiff was referred to physical and occupational therapy. (AR 211.)

On August 24, 2000, plaintiff noted that physical and occupational therapy helped her ankle and that she was pleased with the progress and wanted to continue physical therapy. (AR 120, 207.) Plaintiff complained of constant left arm numbness. (AR 120.) Plaintiff was treated with Ibuprofen and continued on physical therapy and occupational therapy for her ankle. (AR 120.) On August 28, 2000, plaintiff complained of left shoulder pain and was prescribed Ultram and Elavil. (AR 119.) On September 12, 2000, plaintiff complained of left shoulder pain and was assessed left shoulder myofascial pain for which she was continued on Ultram. (AR 118.) On September 13, 2000, plaintiff stated that her "ankle his not even an issue." (AR 207.) On September 18, 21 and 22, 2000, plaintiff noted ankle improvement. (AR 203, 207.)

Plaintiff underwent a September 21, 2000 EMG and nerve conduction studies on her left side to address left hand and arm pain. (AR 205.) The impression of Gurpreet Dhaliwal, M.D., was "an abnormal EMG study which is suggestive of ulnar nerve neuropathy in the left elbow . . . consistent with cubital tunnel syndrome." (AR 205.)

On October 5, 2000, plaintiff complained of shoulder and neck pain and noted that injections "really helped." (AR 117.) Plaintiff was assessed with left shoulder pain and ulnar numbness. (AR 117.) On November 6, 2000, plaintiff again complained of left shoulder pain and stated that an injection

1  "really helped." (AR 116.) A November 25, 2000 MRI of plaintiff's cervical spine revealed neither impingement of plaintiff's spinal cord, disc bulge nor disc hernia. (AR 109.) On December 5, 2000, plaintiff complained of pain to her left shoulder, elbow and fingers and upper back. (AR 115.) Dr. Castro assessed cubital tunnel syndrome and myofascial pain syndrome to her left shoulder. (AR 115.) Dr. Castro referred plaintiff to physical therapy. (AR 202.)

On January 3, 2001, plaintiff complained of pain and pressure to the top her shoulder and numbness in the last two digits of her hand. (AR 200.) On January 5, 2001, plaintiff complained of persistent pain. (AR 186.) On January 9, 2001, plaintiff complained of left shoulder pain and ulnar numbness and burning. (AR 107.) Dr. Castro assessed left cubital tunnel syndrome and left shoulder myofascial pain. (AR 107.) An April 5, 2001 Occupational Therapy Upper Extremity Evaluation noted that plaintiff's range of motion was within normal limits. (AR 181, 185.) On April 13, 2001, plaintiff stated she was doing well and had decreased numbness. (AR 180.) As of May 4 and 11, 2001, plaintiff showed increased strength and endurance in her assigned activities. (AR 180.) On May 25, 2001, plaintiff received urgent care treatment after tripping over a wood pile and experiencing right knee and thumb pain. (AR 178.) Plaintiff was diagnosed with a right knee contusion/abrasion and left thumb sprain. (AR 178.)

On June 15, 2001, Dr. Castro diagnosed left shoulder impingement and prescribed Celebrex. (AR 176.) Left shoulder x-rays of the same date revealed mild osteopenia with neither acute fracture nor acute process. (AR 177.) A June 29, 2001 Occupational Therapy Upper Extremity Evaluation noted range of motion generally within normal limits. (AR 172.) On July 16, 2001, August 14, 2001 and October 5, 2001, Dr. Castro diagnosed left neck/shoulder myofascial pain syndrome. (AR 165, 170, 171.)

Dr. Castro completed an October 5, 2001 Complete Medical Report (Physical) to note his clinical findings of trigger points to plaintiff's left shoulder and muscle spasm. (AR 147.) Dr. Castro diagnosed left shoulder pain (myofascial pain syndrome) and treatment with trigger point injections and Celebrex, Elavil and Ultram. (AR 147.) Dr. Castro noted plaintiff's temporary relief and his "uncertain" diagnosis. (AR 147.)

///

1    Dr. Castro completed an October 16, 2001 Medical Assessment Form to note that plaintiff is able
2  to: (1) occasionally lift up to 10 pounds; (2) sit six hours in an eight-hour workday and one hour without
3  interruption; (2) stand two hours in an eight-hour workday and one hour without interruption; (3) walk
4  two hours in an eight-hour workday and one hour without interruption; (4) continuously engage in
5  simple grasping and fine manipulation with her right hand; (5) occasionally engage in simple grasping
6  and fine manipulation with her left hand; (6) continuously use her feet; (7) occasionally handle and
7  push/pull; and (8) continuously feel, hear and speak.  (AR 148-150.)  Dr. Castro found plaintiff is unable
8  to carry, climb, balance, stoop, crouch, kneel, crawl or reach because of muscle spasm, tenderness and
9  trigger points to her left shoulder.  (AR 149-151.)  Dr. Castro found no restrictions for heights, moving
10 machinery, chemicals, noise, humidity, dust, extreme temperatures or fumes.  (AR 151.)

11   On November 8, 2001, Dr. Castro diagnosed left shoulder pain and referred plaintiff to UC Davis
12 Rheumatology.  (AR 162.)  On December 6 and 27, 2001, plaintiff complained of worse shoulder pain
13 and new symptoms, including headaches, right hand numbness, and upper back pain.  (AR 154, 159.)
14 Dr. Castro assessed systemic polyarthritis and suspected systemic lupus erythematosus ("SLE").  (AR
15 154, 159.)

16   Dr. Castro's January 18, 2002 assessment included SLE.  (AR 153.)  On February 11, 2002,
17 plaintiff claimed medications were not helping.  (AR 275.)  Dr. Castro assessed systemic polyarthritis,
18 fibromyalgia and suspect SLE.  (AR 275.)  On March 11, 2002, plaintiff complained of neck and
19 shoulder pain.  (AR 274.)  On July 2, 2002, plaintiff complained of hand and lower leg pain.  (AR 272.)
20 Dr. Castro assessed SLE.  (AR 272.)  On July 16, 2002, plaintiff complained of neck, shoulder and right
21 knee pain.  (AR 271.)  Dr. Castro assessed right knee effusion.  (AR 271.)  On September 23, 2002,
22 plaintiff complained of neck and shoulder pain and constant aching legs.  (AR 269.)  Dr. Castro assessed
23 SLE and right foot pain.  (AR 269.)

24   February 11, 2003 notes reflect that a rheumatologist told plaintiff that plaintiff did not have
25 SLE.  (AR 268.)  Dr. Castro assessed left wrist ganglion cyst and polyarthritis.  (AR 268.)  On May 13,
26 2003, plaintiff complained of headaches and breathing problems.  (AR 267.)  Dr. Castro assessed
27 migraines, polyarthritis and anxiety/panic disorder.  (AR 267.)  On June 13, 2003, Dr. Castro assessed
28 fibromyalgia and depression/anxiety.  (AR 266.)

### *Robert E. Caton, M.D., Treating Orthopedist*

Plaintiff treated with Robert E. Caton, M.D. ("Dr. Caton"), an orthopedist. On January 16, 2001, plaintiff chiefly complained of left shoulder pain for two years, worsening during the past four months. (AR 103.) Plaintiff noted that two years ago, she started to experience shoulder pain which now radiates to her wrist. (AR 103.) Plaintiff denied dropping objects or loss of strength. (AR 103.) Dr. Caton's examination revealed that neurologically plaintiff's arm is intact with a negative Tinel's and Phalen's tests of plaintiff's left hand. (AR 104.) Dr. Caton's plan included "Flexeril for her very tender and multiple trigger points along the trapezius" and surgery for an ulnar tunnel release. (AR 104.)

On February 27, 2001, Dr. Caton performed a left ulnar nerve transposition for plaintiff. (AR 190, 193.) On March 5, 2001, Dr. Caton noted that plaintiff was "doing well and making good steady progress" and would soon undergo physical therapy. (AR 190.) On April 2, 2001, Dr. Caton noted that plaintiff is "doing well," is unable to work for two months, and "is making good[,] steady progress." (AR 182.) On May 14, 2001, Dr. Caton noted that plaintiff "is doing well," "is making good[,] steady progress" and "is showing good improvement." (AR 179.) Dr. Caton renewed plaintiff's physical therapy for a month and "will continue conservative care only in the meantime." (AR 179.) Dr. Caton renewed plaintiff's Celebrex. (AR 179.) On June 25, 2001, Dr. Caton noted that plaintiff "is doing very well," "has much less radiculopathy," "is making good[,] steady progress," "needs to work only with a continued PT [physical therapy] program at home . . . [and to] [t]ake the occasional anti-inflammatory as needed," and "is doing extremely well and is making excellent progress." (AR 175.) Dr. Caton discharged plaintiff back to Dr. Castro. (AR 175.)

### *Physical Residual Functional Capacity Assessment*

C. Eskander, M.D. ("Dr. Eskander"), completed a May 21, 2001 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (2) lift/carry 10 pounds frequently and 20 pounds occasionally; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; (3) frequently climb, balance, stoop, kneel and crouch; and (4) occasionally crawl. (AR 136, 137.) The physician found plaintiff limited to occasional pushing/pulling in her upper left extremities and occasional reaching and fingering with her left hand. (AR 136, 138.) The physician found neither visual, communicative nor environmental limitations. (AR 138-139.)

*Brian A. Lenser, M.D., Consultative Ophthalmologist*

Brian A. Lenser, M.D. ("Dr. Lenser"), an ophthalmologist, conducted a consultative examination of plaintiff and prepared an April 19, 2003 report. (AR 260.) Plaintiff gave a history of left side corneal abrasion with recurrent erosion. (AR 260.) Dr. Lenser noted no signs of corneal defect or erosion and recommended that plaintiff use a topical hyperosmotic like Muro 128. (AR 260.)

*Medications*

Plaintiff's medications have included Ultram, Elavil, Celebrex 200 mg, Flexeril, Ibuprofen, Amitriptyline 25 mg, Hydroco/Apap5 500 mg, Tramadol 50 mg, Pravachol 40 mg, Cimetidine 400 mg, Letemax .5%, Imitrex 100 mg, Neurontin 300 mg, Vicodin, Tagament 400, and Tens pads, Paxil CR 12.5 and 25. (AR 63, 94, 146, 259, 286.)

**Plaintiff's Activities And Testimony**

*Reports And Questionnaires*

Plaintiff completed a November 6, 2000 Disability Report Adult to noted that she is limited to work from left shoulder and neck pain and inability to raise her arm. (AR 89.) Plaintiff claims she became unable to work on August 15, 2000. (AR 89.) Plaintiff stopped working August 14, 2000 because unbearable shoulder and neck pain prevented her to walk. (AR 89.)

Plaintiff completed a November 7, 2000 Work Activity Report – Employee to noted that she held temporary employment during July-August 2000 as a box sorter. (AR 82.)

Plaintiff completed a March 8, 2001 Pain Questionnaire to claim that her pain from her neck to her shoulder started September 2000. (AR 64.) The pain is constant and increases when plaintiff raises her arm. (AR 64.) After a half an hour, medication relieves plaintiff's pain and she needs to sit down. (AR 64.) The medication causes sleepiness but plaintiff cannot sleep when the medication does not work. (AR 64.) Plaintiff received injections in her shoulder for pain. (AR 65.) Physical therapy increased plaintiff's pain. (AR 65.) The pain prevents plaintiff to walk far, vacuum, mop, and lift groceries. (AR 65.) Plaintiff does not drive much because of pain to look over her right shoulder. (AR 65.) Although plaintiff claims that she is unable to drive because of her medication, she noted that she drives "when I have to and have no one to take me." (AR 66.) Plaintiff is able to walk half a mile, stand one and a half hours, and sit two hours. (AR 66.) Plaintiff needs assistance with sweeping,

mopping, vacuuming, and scrubbing the bathroom. (AR 66.) Plaintiff is unable to hold her 1½ year old daughter. (AR 66.)

Plaintiff completed an undated Reconsideration Disability Report to note that her fingers go numb and she experiences "a burning feeling" and spasms on her left hand. (AR 67.) Plaintiff's pain is constant, and injections for her left shoulder "no longer work." (AR 67.) Plaintiff is unable to lift her arm due to neck and shoulder pain. (AR 67.) Dr. Caton advised her not to lift anything. (AR 67.) Plaintiff experiences difficulty mopping and sweeping and numbness when she holds something in her left hand. (AR 69.) Plaintiff experiences pain to comb her hair and to lift her arm and spasms when she holds a brush. (AR 69.) Plaintiff experiences difficulty to drive, and the seat belt over her shoulder hurts. (AR 69.) Pain medication causes drowsiness and constant sleepiness. (AR 69.)

Plaintiff completed an undated statement to note that she underwent February 27, 2001 surgery for nerve entrapment of her left elbow and that although she no longer experienced finger tingling, she continued to experience neck and shoulder pain. (AR 62.) Plaintiff claimed inability to hold heavy objects in her left hand, difficulty combing her hair, constant pain, and ineffectiveness of medication to relieve headaches. (AR 62.)

In an undated recent medical treatment form, plaintiff noted she was told that she has a bone spur and arthritis in her neck which is "very painful." (AR 145.)

***Plaintiff's Testimony At February 25, 2002 ALJ Hearing***

Plaintiff testified at the February 25, 2002 ALJ hearing that she lives in a house with her husband and five children, who at the time of the hearing ranged from age two to 18. (AR 291.) Plaintiff is primarily responsible to care for her youngest child. (AR 292.) Plaintiff has a driver's license and on an average week drives 15 times to pick up her children from school. (AR 292-293.) Three miles is the farthest plaintiff drives. (AR 293.) She drives a five-speed transmission. (AR 293.)

In July and August 2000, plaintiff worked temporary jobs as an inspector at a wine company and as a food company packer. (AR 294-295.) Plaintiff has not since worked. (AR 295.)

Plaintiff does not believe she can work because her "entire body" is in constant pain. (AR 295.) Plaintiff's neck and left shoulder hurt more than other body parts. (AR 299.) Plaintiff experiences muscle spasms in her hands, more so in her left. (AR 299.) After her surgery for left ulnar entrapment,

8

feeling returned to plaintiff's fingers but her pain persisted. (AR 301.)  Plaintiff uses no assistive devices or braces. (AR 296, 304.)  Plaintiff's medications help but cause headaches, nausea, fatigue and sleepiness. (AR 296.)  Plaintiff's doctor lowered her medication's dosage after she told him of the problems. (AR 296.)  Plaintiff attributes a 30-pound weight gain to her medications. (AR 303.)

Plaintiff estimates that she is able to sit for 20 minutes, stand or walk for 30 minutes, lift/carry ten pounds, and use her hands to write or grasp things for 15-20 minutes. (AR 297, 303.)  After using her hands for writing or grasping things, plaintiff needs to rest her hands for 10-15 minutes because of spasms. (AR 303.)  In an eight-hour workday, plaintiff estimates that she could use her hands for two hours. (AR 303.)

On a normal day, plaintiff attempts housework, including washing dishes and dusting. (AR 297.)  Plaintiff shops once a week. (AR 297.)  Plaintiff attends school activities of her children. (AR 298.)  Plaintiff rarely watches television. (AR 298.)

Dr. Castro diagnosed plaintiff with lupus which affects her thigh muscles down to her ankles. (AR 300, 301.)  Dr. Castro told plaintiff to take medication for such leg pain. (AR 302.)  A rheumatologist told plaintiff that she had all the symptoms of lupus but that her doctors "just took care of the parts that were hurting because they assumed it was due to the ulnar nerve entrapment." (AR 302.)

On Dr. Castro's advice, plaintiff uses a heating pad three times a day for an hour to relieve pain. (AR 303-304.)  Physical therapy worsened plaintiff's neck and shoulder pain. (AR 304.)  Plaintiff is most comfortable reclining with her legs up to relieve pressure on her neck and legs. (AR 304.)  Plaintiff reclines with her legs up four or five hours a day for up to two hours a time for a total of eight to ten hours per day to relieve pain. (AR 304-305.)  Plaintiff experiences sleep difficulty and sleeps three hours a night. (AR 305.)  Plaintiff sleeps during the day in her recliner. (AR 305.)

### *Plaintiff's Testimony At June 24, 2003 ALJ Hearing*

Plaintiff testified at the June 24, 2003 ALJ hearing that she has neither performed work nor applied for jobs since the February 25, 2002 ALJ hearing. (AR 311.)  Since the February 25, 2002 hearing, plaintiff's constant pain has worsened in her legs and left shoulder. (AR 312.)  Plaintiff is scheduled for no upcoming surgery. (AR 312.)  There have been no major changes in plaintiff's daily

activities or abilities since the February 25, 2002 hearing. (AR 312.)

***Vocational Expert's Testimony At June 24, 2003 ALJ Hearing***

At the June 24, 2003 ALJ hearing, vocational expert Susan Moranda ("Ms. Moranda") identified plaintiff's past relevant work as a medical office operator (sedentary and unskilled), water tester (light and unskilled), and taper loader (light and unskilled). (AR 313-317.) As a first hypothetical, the ALJ asked Ms. Moranda to assume a person who: (1) is plaintiff's age; (2) has an eighth grade education with ability of simple reading and writing of English; (3) has the same past relevant work history as claimant; (4) is limited to lift/carry less than 10 pounds occasionally; (5) is able to sit six hours but no more than an hour at a time during an eight-hour workday; (6) is able to stand or walk two hours but no more than an hour at a time during an eight-hour workday; (7) is able to use left upper extremity occasionally for simple grasping and manipulation; (8) is unable to climb, balance, stoop, crouch, kneel, crawl or reach; (9) is able to occasionally handle, push or pull; and (10) is unable to work around vibrations in the workplace. (AR 318.) Ms. Moranda opined such person with plaintiff's expected transferable skills could perform neither plaintiff's past work nor unskilled, semiskilled or skilled jobs because a limitation of lifting/carrying less than ten pounds appears to be less than sedentary. (AR 318-319.)

As a second hypothetical, the ALJ asked Ms. Moranda to assume a person who: (1) is plaintiff's age; (2) has plaintiff's education and past relevant work history; (3) is limited to lifting/carrying 20 pounds occasionally and ten pounds frequently; (4) is able to sit, stand or walk six hours in a normal eight-hour workday; (5) is able to occasionally engage in reaching and/or fingering with the left upper extremity; and (6) is able to crawl occasionally. (AR 319.) Ms. Moranda opined that such person could not perform plaintiff's past work. (AR 319.) As to semiskilled or skilled jobs for such person with plaintiff's transferable skills, Ms. Moranda identified no jobs. (AR 319-320.) As to unskilled jobs, Ms. Moranda identified theater usher (2,500 jobs in California), restaurant hostess (2,000 jobs in California), surveillance system monitor (3,250 jobs in California).

As his first hypothetical, plaintiff's attorney asked Ms. Moranda to assume the ALJ's second hypothetical and frequent use of the right upper extremity for reaching, handling, grasping and fingering for two-thirds of the workday. (AR 322.) Ms. Moranda opined there would be no significant change in ability to perform the three identified jobs in that there would be no more than frequent use of the

10

right upper extremity.  (AR 323-324.)

As his second hypothetical, plaintiff's attorney asked Ms. Moranda to assume the ALJ's second hypothetical and limitation of occasional head movement. (AR 324.)  Ms. Moranda opined such additional limitation would limit ability to perform the three identified jobs. (AR 324.)

**The ALJ's Findings**

In his September 19, 2003 decision, the ALJ identified the specific issue as whether plaintiff is under a disability, which is defined as the inability to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than 12 months.  (AR 16-17.)  In concluding plaintiff is capable to adjust to work that exists in significant numbers in the regional economy and is entitled to neither disability insurance benefit nor SSI, the ALJ found:

1. Plaintiff has an impairment or combination of impairments considered "severe" but which do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2. Plaintiff's allegations regarding her limitations are not totally credible;

3. Plaintiff has the residual functional capacity to perform light work with non-exertional limitations of occasional crawling and occasional engaging in reaching and fingering with her left upper extremity.

4. Plaintiff is unable to perform her past relevant work.

5. Plaintiff has transferable skills from her past relevant work.

6. Plaintiff has the residual functional capacity to perform a significant range of light work.

7. Although plaintiff's exertional limitations preclude her to perform the full range of light work and using the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2 ("Medical-Vocational Guidelines"), there are a significant number of jobs in the national economy which plaintiff could perform and include theater usher, hostess and surveillance system monitor.  (AR 22-23.)

/ / /

/ / /

# DISCUSSION

## Standard of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[1] Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995. If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988). "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

---

[1] "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

and detailed objective medical reports of her condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind. You are responsible for providing that evidence.")

Here, plaintiff chiefly claims disability since August 2000 based on left shoulder and neck pain and inability to lift her left arm. (AR 56, 89, 215, 306.) At the February 25, 2002 ALJ hearing, plaintiff attributed her symptoms to lupus. (AR 300, 301.) As discussed below, this Court finds that the ALJ properly evaluated the evidence and that his conclusion that plaintiff is not disabled is based on proper legal standards and substantial evidence.

With these standards in mind, this Court turns to plaintiff's criticisms of the ALJ's September 19, 2003 decision.

## **Evaluation Of Dr. Castro's Opinion**

Plaintiff contends that the ALJ failed to fully and fairly review Dr. Castro's opinion. The Commissioner responds that the ALJ properly rejected Dr. Castro's opinion.

A treating physician's opinion is not conclusive as to a claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[2] An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751. Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

---

[2] A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e). The Commissioner has final responsibility to determine a claimant's residual functional capacity. 20 C.F.R. § 404.1546.

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

*Magallanes*, 881 F.2d at 751(citations omitted.)

An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See, e.g., Sandgathe*, 108 F.3d at 980. A physician's opinion of disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies"). "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

After reviewing the medical evidence, the ALJ explained his proper rejection of Dr. Castro's opinion and acceptance of Dr. Eskander's assessment:

> . . . The undersigned gives minimal weight to this assessment because the doctor's opinion contrasts sharply with the other evidence of record, which renders it less persuasive. Specifically, Dr. Castro's limitations are too restrictive and not supported by the objective medical evidence (Exhibit 1F/8, 4F/23, and 4F/25). In addition, Dr. Castro's report is inconsistent with the State Agency ("DDS") findings, which are given great weight for the reasons stated below.
>
> . . .
>
> DDS completed an assessment of the claimant and found that she was able to lift 20 pounds occasionally and 10 pounds frequently. The DDS consulting physician assessed the following: the claimant could stand, walk, and sit for 6 hours in an 8-hour workday; she could only occasionally push and pull with the left upper extremity; and she could also occasionally crawl and do no more than occasional reaching and fingering with the left upper extremity (Exhibit 2F/14-21). The undersigned gives great weight to the assessments of this physician, in accordance with 20 CFR §§ 404.1527(ii)(6) and 416.927(ii)(6), because that physician is familiar with the Social Security Disability Program and its evidentiary requirements, and because his findings are consistent with the objective medical evidence. (AR 19-20.)

14

1    Plaintiff fails to demonstrate misplacement of the ALJ's reliance on the assessment of Dr.
2 Eskander, the DDS physician.  Although Dr. Eskander is a non-treating, non-examining physician, his
3 findings "can amount to substantial evidence, so long as other evidence is the record supports those
4 findings."  *Saelee*, 94 F.3d at 522.  As noted by the Commissioner, Dr. Eskander's opinion is consistent
5 with the medical evidence, and Dr. Castro's October 2001 limitations were unsupported by objective
6 medical evidence.  For example, August 11, 2000 diagnostic imaging revealed plaintiff's normal
7 thoracic spine.  (AR 110.)  In the fall 2000, plaintiff noted relief to her left shoulder from injections.
8 (AR 116, 117.)  A November 25, 2000 MRI of plaintiff's cervical spine revealed neither impingement
9 of plaintiff's spinal cord, disc bulge nor disc hernia.  (AR 109.)  An April 5, 2001 Occupational Therapy
10 Upper Extremity Evaluation noted plaintiff's range of motion within normal limits.  (AR 181, 185.)
11 June 15, 2001 left shoulder x-rays revealed mild osteopenia with neither acute fracture nor acute process.
12 (AR 177.)  A June 29, 2001 Occupational Therapy Upper Extremity Evaluation noted plaintiff's range
13 of motion generally within normal limits.  (AR 172.)  February 11, 2003 treating notes reflect that a
14 rheumatologist told plaintiff that she did not have SLE.  (AR 268.)  Dr. Castro's treating records are
15 inconsistent with his severe limitations.

16    Moreover, Dr. Canton's January 16, 2001 examination revealed that neurologically plaintiff's
17 arm is intact with a negative Tinel's and Phalen's tests of plaintiff's left hand.  (AR 104.)  After
18 performing the left ulnar nerve transposition for plaintiff, Dr. Canton consistently noted that plaintiff "is
19 doing well and making good[,] steady progress," "is showing good improvement," and "is doing
20 extremely well and is making excellent progress."  (AR 175, 179, 182, 190.)  The medical evidence fails
21 to support Dr. Castro's assessment and bolsters Dr. Eskander's assessment.

## Evaluation Of All Medical Evidence

23    Plaintiff argues that the ALJ did not "properly review the evidence as a whole" by failing to
24 evaluate plaintiff's claims of polyarthritis, fibromyalgia, SLE, mental impairment, visual impairment,
25 and obesity.  The Commissioner counters that the ALJ met his burden to detail and summarize
26 thoroughly the facts and conflicting clinical evidence, to interpret them, and to make findings.  The
27 Commissioner further responds that plaintiff failed to meet her burden to establish that she had
28 impairments she claims.

The SSA regulations provide: "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as "[u]nderstanding, carrying out, and remembering simple instructions." 20 C.F.R. §§ 404.1521(b)(1), (3), 416.921(b)(1), (3). At step two of the five-step disability analysis, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, and without regard to whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Such inquiry "is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting Social Security Ruling (SSR) 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)). If a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

The United States Supreme Court has explained application of the Listing of Impairments:

> The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . . "The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding – no matter to what extent that finding may exceed the listed value."
>
> . . .
>
> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity."

*Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885 (1990) (italics in original; citations omitted).

"While the Listing of Impairments does describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's

'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d); *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985)) (bold added).

To "meet" a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his/her claim. *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment. *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the evidence supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180 F.3d at 1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

The ALJ adequately explained his rationale that plaintiff did not have lupus:

> The medical evidence does not support the claimant's allegation of lupus as a medically determinable impairment. The medical evidence shows that lupus was suspected (Exhibit 8F/4, 8, 10), but there is no objective medical evidence confirming a diagnosis of lupus. Thus, lupus is not a severe impairment under the Regulations. (AR 18.)

The treating records show that a rheumatologist informed plaintiff she did not have SLE. (AR 268.) Furthermore, there is an absence of evidence of SLE, visual impairment, and fibromyalgia. Plaintiff points to no obesity diagnosis. The medical record lacks evidence of functional impairment based on plaintiff's claimed impairments, including polyarthritis. Dr. Castro's limitations are based on plaintiff's left shoulder claims, including trigger points, tenderness and muscle spasms. (AR 147, 149.) Plaintiff fails to demonstrate the additional impairments which she claims.

In passing, plaintiff asserts the ALJ "did not develop the mental health impairments." "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001). There is no suggestion of an ambiguous or inadequate record. At the June 24, 2003 ALJ hearing, plaintiff's counsel twice acknowledged that "the record is complete" and denied the ALJ's invitation for more records. (AR 311, 326.) In addition, plaintiff acknowledged neither new health diagnoses nor new health problems. (AR 312.) Plaintiff fails to demonstrate grounds to further develop

1  the record.

## Hypothetical To Ms. Moranda

Plaintiff challenges the ALJ's second hypothetical to Ms. Moranda and claims the ALJ's first hypothetical "brought the proper conclusion, that plaintiff cannot do any work."

In the final step of the five-step disability evaluation, the Commissioner has the burden to show, in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work that exists in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations." *Roberts*, 66 F.3d at 184. Alternatively, the Commissioner can refer to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial evidence in the record." *Osenbrock*, 240 F.3d at 1165. An ALJ may so limit a hypothetical even when medical evidence conflicts. *Magallanes*, 881 F.2d at 756. "An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757. The parameters of an ALJ's hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). An ALJ is not bound to accept restrictions in a hypothetical question of claimant's counsel. *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

As discussed above, the substantial evidence of the record fails to support the limitations suggested by Dr. Castro or plaintiff. The ALJ's second hypothetical was based on Dr. Eskander's opinion and in turn, supported by substantial evidence. Plaintiff points to no meaningful error with the ALJ's second hypothetical, which addressed limitations found by the ALJ. The evidence supports the scope of the hypothetical relied upon by the ALJ. The ALJ was free to exclude from his hypothetical limitations not supported by substantial evidence, including those proffered by plaintiff's counsel.

## CONCLUSION AND RECOMMENDATION

For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

Court RECOMMENDS to:

1. DENY plaintiff's request to reverse the Commissioner's decision denying plaintiff's claims for disability insurance benefits and SSI, or to remand for further proceedings; and

2. DIRECT the Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff Cristina Barron.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304. No later than November 11, 2005, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties and the magistrate judge and otherwise in compliance with this Court's Local Rule 72-304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Responses to objections shall be filed and served no later than November 25, 2005 and otherwise in compliance with this Court's Local Rule 72-304(d). A copy of the responses shall be served on the magistrate judge. The district judge will review the magistrate judge's findings and recommendations, pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   October 27, 2005**             **/s/ Lawrence J. O'Neill**
66h44d                                                    UNITED STATES MAGISTRATE JUDGE